UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

WESLEY PRYOR, *et al.*,                    )
                                           )
      Plaintiffs,                    )
                                           )
v.                                         )          No. 4:20-cv-00014-SKL
                                           )
COFFEE COUNTY, TENNESSEE, *et al.*,        )
                                           )
      Defendants.                    )

## MEMORANDUM AND ORDER

This is a civil rights action filed pursuant to 42 U.S.C. § 1983 with related state law tort

claims. Plaintiffs Wesley Pryor ("Wesley") and Suzanne Drivas Pryor ("Suzanne," and

collectively, "Plaintiffs"[1]) assert 11 different claims against Defendants Coffee County, Tennessee

(the "County" or "Coffee County"); Deputy Michael Sharpe; Sergeant Dustan Foster; and Sheriff

Chad Partin (collectively, "Defendants"). Currently before the Court is Defendants' motion for

summary judgment, which is accompanied by a supporting brief and a number of exhibits [Doc.

38, Doc. 39, and Doc. 40]. Plaintiffs filed a response in opposition with their own supporting brief

and exhibits [Doc. 48 and Doc. 50], and Defendants filed a reply [Doc. 55]. This matter is now

ripe. Neither party requested a hearing and the Court has determined a hearing is not necessary.

## I.    FACTUAL BACKGROUND

Wesley's brother Jonathan Pryor died by suicide in his residence at 1155 Newt Vanattia

Road, Hillsboro, Coffee County, Tennessee, on May 24, 2019. He was known by his family

---

[1] Because there are a number of members of the Pryor family referenced in this Memorandum and
Order, the Court will primarily use their first names.

members to have mental health issues, and he had received treatment from Centerstone Mental Health Facility. Stella Pryor, Wesley and Jonathan's mother, discovered Jonathan's body. Stella was living next door to Jonathan at 1129 Newt Vanattia Road. The two properties are separated by a chest level wire fence. At all relevant times, Plaintiffs (Wesley and his wife, Suzanne), were the owners of 1155 and 1129 Newt Vanattia Road. Plaintiffs resided in Wartrace, Tennessee, which is about a 45-minute drive from the Newt Vanattia Road properties.

When Stella discovered the body, she called 911; she also called members of her family including Wesley and a woman named Heather Jones who lived nearby. Sergeant Foster and Deputy Sharpe were both dispatched to the scene of Jonathan's death. Sergeant Foster was the supervising officer for the scene, and Deputy Sharpe's primary roles were to secure the scene and gather information and statements from witnesses. Although the officers knew a person had died, they did not know the cause of death. Neither of them had previously been to either of the properties or had any contact with any member of the Pryor family.

Plaintiffs began driving to the scene shortly after receiving the news from Stella. Wesley was distraught [Doc. 48-1 at Page ID # 440 (Wesley Depo.)]. On the drive over, Suzanne spoke about Centerstone and questioned whether Jonathan's providers knew he was suicidal [Doc. 48-2 at Page ID # 502 (Suzanne Depo.)]. When Plaintiffs arrived at Stella's residence, Stella was screaming and crying [Doc. 48-3 at Page ID # 517 (Stella Depo.)]. In particular, she was screaming and crying because she had no money to pay for a burial for Jonathan, but in an attempt to calm Stella down, Wesley told Stella that he and Suzanne (Plaintiffs) would pay for the burial and other arrangements [*id.* at Page ID # 518].

Wesley testified that he was "distraught" and "angry" when he got out of the car [Doc. 48-1 at Page ID # 442]. He denied being "upset." [*Id.* at Page ID # 441-42]. After reassuring Stella

about burial expenses, Plaintiff began walking away from Stella and loudly questioned, "Where was Centerstone in this whole thing?  They knew that he was subjectible [sic] to committing suicide.  He begged them for help.  And all they wanted to do was shove pills down his throat." [*Id.* at Page ID # 441].  He also proclaimed that if he found out Centerstone "played any part of it," then he would spend his last dime suing the facility [*id.*].

Sergeant Foster observed Plaintiffs arrive at Stella's residence.  Plaintiffs had their emergency flashers activated as they pulled in.  When Wesley got out of his car, Sergeant Foster observed that Plaintiff had a gun in a Velcro-strap holster on his right side.  Sergeant Foster did not mention the gun to any other officers at the scene or question Wesley or anyone else about it.

Sergeant Foster's intention at that moment was to leave the scene to attend to an unrelated accident with injuries on Interstate 24, and so he was walking toward his parked patrol car.  However, upon observing and hearing Wesley, he apparently decided to stay and began walking toward Wesley.  He testified that Wesley was "flailing his hands up," which Plaintiffs have not disputed [Doc. 38-5 at Page ID # 257 (Foster Depo.)].  He also testified Wesley was using profane language in his comments about Centerstone, which Wesley disputes [*id.* at Page ID # 255; Doc. 38-1 at Page ID # 193 (Wesley Depo.)].  Regardless, Wesley (whose account the Court generally must accept at this stage) described the subsequent exchange between himself and Sergeant Foster as follows:

> After I made a comment about Centerstone, he was on the other side of the fence, on a separate piece of property.  I made the comments about Centerstone.  He said, "You need to shut your mouth now."
>
> Whenever he hollered at me, telling me to shut up, I told him – I hollered back at him and told him he could go f*** himself.  "I'm not talking to you."
>
> And he said, "I told you to shut your mouth."

I said, "I don't have to do a damn thing. This is my property.
I own it."

[Doc. 48-1 at Page ID # 444 (Wesley Depo.)]. While Sergeant Foster disputes some of the language used, he admitted Plaintiff did not threaten him or anyone else at the scene, and Plaintiff never reached for his gun [Doc. 48-7 at Page ID # 574 (Foster Depo.)].

Deputy Sharpe had been speaking to Stella and another witness, and he planned to walk "down to the house" where an investigator was working the actual scene of Jonathan's death [Doc. 38-6 at Page ID # 275 (Sharpe Depo.)]. However, upon hearing what he described as "commotion" between Sergeant Foster and Wesley, he walked toward Wesley instead [*id.* at 275-76, 285]. He instructed Wesley: "Sir, calm down. I understand you just lost someone. Just try to calm down." [Doc. 48-1 at Page ID # 450 (Wesley Depo.)]. Like Sergeant Foster, Deputy Sharpe readily observed Wesley's gun. According to Deputy Sharpe, Wesley was "very irate" at this point [Doc. 38-6 at Page ID # 288 (Sharpe Depo.)]. This is consistent with Wesley's admission that he was repeatedly cursing at Sergeant Foster. Moreover, Wesley admitted he told Deputy Sharpe he was "trying" to calm down, but was unable to [Doc. 48-1 at Page ID # 445 (Wesley Depo.)].

According to Wesley, he was standing face-to-face with Deputy Sharpe when Sergeant Foster approached them, and Sergeant Foster said, "I told you to shut your mouth," to which Wesley responded, "I done told you, I'm not f****** talking to you, . . . I'm talking to this deputy." [*Id.* at Page ID # 450-51]. As Wesley turned away from Sergeant Foster to continue his conversation with Deputy Sharpe, he heard someone yell, "He's got a gun!" [*Id.* at Page ID # 451].

At this point, the interaction became physical. Wesley described it as follows:

Next thing I know, Foster is grabbing my right arm. He's jerking me to the right. Deputy Sharp grabs my left arm. He's jerking me to my left. They're playing tug-of-war.

4

Foster grabs for my gun that's under my shirt. And he's jerking me, jerking me, and jerking me, and jerking me. They're playing tug-of-war with me.

After the weapon comes off, one of the two of them kicks my feet from underneath me. I went down face-first.

Next thing I know, Deputy Sharpe is in the middle of my back, in my low back with his knee. Foster has got my left arm, twisting it above my head, going toward the direction that he was in, hollering, "Put your arm behind your back."

And I said, "I can't. My arm won't go that way."

He said, "Put your arm behind your back."

I said, "I can't. My arm won't go that way."

At which point he comes down with his knee and plows it into my neck. And he's putting pressure on my neck. I'm hollering, "Get off my f****** neck. I've had neck surgery. Get off my f****** neck."

I heard my mom and them hollering at Deputy Sharpe, "Get off his back."

. . . .

Deputy Foster [sic] continues to twist my arm, trying to bring it above my head and bring it around. I'm hollering, "It won't go that way. Get off my neck. Get the f*** off my neck."

And every time I would say, "Get the f*** off my neck," he would go up in the air and come down and plummet me with his knee. Which you can see that in the video. He done that multiple times.

At which point, the last time he did it, he went up in the air, shoved my mom back into a barbed wire fence, and then he come back down. I guess that's whenever he let go of my arm. And whenever he did, they was able to put my arm behind my back.

And, then, at which point Deputy Sharp grabbed ahold of my arms, not by my shoulders but by my arm, and pulled me up . . . which, in turn, caused the cuffs to go down on my bone.

5

[*Id.* at Page ID # 451-53].

In the meantime, Sheriff Partin arrived at the scene and observed Sergeant Foster and Deputy Sharpe escorting Wesley to a patrol car. Wesley testified that he (Wesley) was "hollering and screaming" that the officers attacked him [*id.* at Page ID # 453].

Wesley and Sergeant Foster had another hostile verbal exchange, with Sergeant Foster telling Wesley again to "shut [his] mouth," and Plaintiff responding, "I don't have to do a damn thing. I've got a First Amendment right. I can say whatever I want to. Just like your momma can s*** my d***." [*Id.* at Page ID # 453-54]. According to Wesley, the officers then proceeded to inflict more physical abuse:

> At which point he [Sergeant Foster] took my wrist, my right wrist, twisted it, jerked it way up in behind my back. Took his right hand, slammed it into my chest, and took his fingernails and then impaled them into my chest. Which you have pictures of that.
>
> And then him—Foster and Sharpe took me down to the patrol car. On the way to the patrol car, he made a sarcastic—Sharpe made a sarcastic comment. Which I can't remember exactly what it was.
>
> We get to the car. I asked Deputy Sharpe, I said, "Can you please loosen the handcuffs?" I said, "They're crushing my wrists."
>
> And at this point, Foster said, "Quit acting like a little b**** and get in the car."
>
> I told him, I said, "I'm not acting like a little b****."
>
> And as I'm sitting down, he pushes me back—Foster pushes me backwards. I hit my head on the back of the car as I'm getting in.
>
> So I sit down in the seat. I put my right foot in first. I'm scooting back. I'm bringing my left foot in. As I'm bringing my left foot in, he takes—Foster takes and shuts the door.

6

My toe is caught in between the door and the cage. I start hollering and screaming, "My foot's in the door. My foot's in the door."

They both looked in the window, laughed, and then walked off. At which point the two deputies and the sheriff wind up standing out in the street. I'm in the back of the patrol car hollering and screaming, "My toe's in the door. Please open the door." Nobody comes back.

About 20 minutes later, Deputy Sharp[e] shows back up to his patrol car. He gets in his—he gets in his front seat. At which point, I tell him, "My toe is in the door. Would you please open the door. My toe is in your freaking door." "F****** door" is actually what I said.

He gets out of his patrol car. He looks back in the window. He opens the door. I move my foot. And he goes—snickering, he goes, "Oh it was in there." And then I move my foot. He shuts the door.

[*Id.* at Page ID # 453-55].

Wesley contends he was not resisting the officers in any way and that he was attempting to comply with their commands to put his arms behind his back but he was unable to due to a medical condition, of which he and his family members alerted the officers [*id.* at Page ID # 457, 460]. Suzanne's testimony does not differ from Wesley's in any significant way [Doc. 48-2 (Suzanne Depo.)].

All in all, Wesley claims that during the initial take down/handcuffing, one of the officers kicked his legs out from under him, and that Sergeant Foster jumped up and down using his knee on his (Wesley's) neck at least five times, kicked him in the ribs three times, and forcefully twisted his left arm behind his back, despite Wesley's protests regarding his medical condition. He claims Deputy Sharpe kneeled into his back, and when standing him up, Deputy Sharpe pulled him up by his arms which caused his hand cuffs to push down on his wrist bone [Doc. 48-1 at Page ID # 453 (Wesley Depo.)]. On the way to the patrol car, Wesley claims Sergeant Foster twisted his right

wrist, and slammed/clawed him in the chest with Sergeant Foster's hand and fingernails. He asserts Deputy Foster pushed him backwards into the patrol car causing him to hit his head, slammed the door on his toe, and then both officers ignored his pleas to release his toe. He also claims Deputy Sharpe "braked abruptly" on the drive to the police station, causing him to "slam" his face "into the cage." [*Id.* at Page ID # 475].

Plaintiffs also claim Wesley made repeated requests to receive medical attention for his injuries. Wesley testified that Deputy Sharpe relayed the requests to someone at the police station, but that person responded that Sheriff Partin wanted to see Wesley personally [*id.* at Page ID # 476]. When they arrived at the police station, Wesley was quickly taken into Sheriff Partin's office, rather than into booking. Deputy Sharpe and Sergeant Foster were also present in Sheriff Partin's office. Wesley again requested medical treatment, and he claims Sheriff Partin responded that because Wesley was not in custody, the police were not required to give him any medical treatment [*id.* at Page ID # 479]. He claims Sheriff Partin also warned him several times to forget the incident ever took place before driving him home. Once they arrived at 1129 Newt Vanattia, Sheriff Partin reportedly told Wesley, "You know, for what it's worth, the deputy sat and said that he's sorry; that he might have got a little aggressive. But he just wanted to apologize . . . ." [*Id.* at Page ID # 486]. Wesley was never charged with a crime relating to the events on May 24, 2019.

Regarding injuries, Plaintiffs assert that during the takedown, Wesley hit his right wrist on a rock, which required him to "redo" carpal tunnel surgery [*id.* at Page ID # 466]. They claim that when Sergeant Foster was twisting Wesley's left arm, he "ripped a muscle off the bone," which had to be reattached using a screw, and furthermore, that the twisting caused Wesley's rotator cuff to tear, which will require surgery [*id.* at Page ID # 466-67]. In addition, Plaintiffs claim Wesley experienced bruises, scratches, and swelling in his chest, and bruised ribs caused by the abuse

8

inflicted by Sergeant Foster, and he experienced swelling in his toe from having it stuck in the door. Psychologically, Plaintiffs assert Wesley is now afraid to carry a gun, and he does not sleep in the same bed as his wife because he has bad dreams, including one during which he struck her in the head while asleep.

Heather Jones, a relative of Plaintiffs, recorded part of the incident with her cell phone [Doc. 38-10]. The video is grainy and Sergeant Foster's actions are partially obscured by Deputy Sharpe. Both sides claim the video supports their version of events.

Plaintiffs filed suit on April 3, 2020. In their amended complaint, they assert 11 substantive claims, including six claims arising under federal civil rights statutes, and five state law claims. Some of the claims appear to be misnumbered, or at least confusingly numbered [*see* Doc. 19]: Count I – Excessive Force; Count II – Failure to Intervene; Count III – Unlawful Seizure and False Arrest; Count IV – Substantive Due Process; Count V – Failure to Train & Supervise and Custom of Defendant Coffee County; Second Count V – Civil Conspiracy; Count VI – Negligent Use of Force; Count VII – Battery; Count VIII – False Arrest; Second Count IV: Liability for Actions of the Sheriff's Deputies; Second Count VII – Plaintiff Suzanne Drivas Pryor's Loss of Consortium.

Defendants moved for summary judgment on all of Plaintiffs' claims on November 15, 2021 [Doc. 38 & Doc. 39]. Sheriff Partin, Sergeant Foster, and Deputy Sharpe argue they are entitled to qualified immunity on the federal law claims asserted against them in Counts I through IV.[2] Defendants argue Plaintiffs' municipal liability claim in Count V fails because Plaintiffs have not alleged any similar incidents and the record plainly reflects the officers' training was

---

[2] There is no dispute the officers were all acting under color of law at all relevant times. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) ("To succeed on a claim under section 1983, the claimant must demonstrate both that the conduct complained of was committed by a person acting under color of state law and that the conduct deprived the claimant of rights, privileges or immunities secured by the Constitution or laws of the United States.").

appropriate. Defendants argue Plaintiffs' civil conspiracy claim (Second Count V) fails for several reasons, including that Plaintiffs do not allege a class or race-based discriminatory animus.

Defendants argue all state law claims asserted against Sheriff Partin, Sergeant Foster, and Deputy Sharpe should be dismissed for essentially the same reasons the federal claims asserted against them should be dismissed. Furthermore, as for Second Count IV, Coffee County contends that it cannot be liable for any negligence-based claims pursuant to the Tennessee Government Tort Liability Act ("GTLA"). Finally, Defendants argue Suzanne's loss of consortium claim fails because "there is no loss of consortium claim under § 1983." [Doc. 39 at Page ID # 394 (quoting *Mitchell v. City of Morristown*, No. 2:07-CV-146, 2012 WL 2501102, at *9 n.9 (E.D. Tenn. June 28, 2012)).

Regarding Defendants' claims of qualified immunity, Plaintiffs argue that when the proper standards are applied, "there are disputed questions of fact on witness credibility and dispositive issues that negate the appropriateness for summary judgment in this case." [Doc. 50 at Page ID # 622]. Plaintiffs further argue that their state law claims should all survive. They contend Coffee County could be liable for any non-negligent torts (for example, intentional torts) committed by the officers, and, as with the federal claims, there are disputed questions of material fact making summary judgment inappropriate against the individual officers. Plaintiffs argue Suzanne's loss of consortium claim survives with any viable state law claims. However, Plaintiffs "do not dispute the Defendants' position on their civil conspiracy or Federal Municipal Liability claims under Section 1983." [*Id.* at Page ID # 647].

The Court will address the qualified immunity issues on the federal claims first, in the order addressed by the parties in their briefs, and then the state law issues. Count V (county liability

under § 1983) and Second Count V (civil conspiracy) will be dismissed pursuant to Plaintiffs'

decision not to dispute Defendants' position on these claims.

## II.    STANDARDS

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "material" fact is one that *matters*—i.e., a

fact that, if found to be true, might "affect the outcome" of the litigation.  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine" dispute exists with respect to a material fact

when the evidence would enable a reasonable jury to find for the non-moving party.  *Id.*; *Jones v.

Sandusky Cnty., Ohio*, 541 F. App'x 653, 659 (6th Cir. 2013); *Nat'l Satellite Sports, Inc. v. Eliadis

Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  In determining whether a dispute is "genuine," the court

cannot weigh the evidence or determine the truth of any matter in dispute.  *Anderson*, 477 U.S. at

249.  Instead, the court must view the facts and all inferences that can be drawn from those facts

in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports*, 253 F.3d at 907.

The moving party bears the initial burden of establishing that no genuine issues of material

fact exist.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986).  To refute such a showing, the

non-moving party must present some significant, probative evidence indicating the necessity of a

trial for resolving a material, factual dispute.  *Id.* at 323.  A mere scintilla of evidence is not enough.

*Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

The court's role is limited to determining whether the case contains sufficient evidence from which

a jury could reasonably find for the non-moving party.  *Anderson*, 477 U.S. at 248, 249; *Nat'l

Satellite Sports*, 253 F.3d at 907.

A number of issues relate to Defendants' entitlement to qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A "defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Id.* (quoting *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011)). As the court explained in *Williams*:

> Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. That is, although on summary judgment this Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party, when a defendant raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right.

*Id.* at 430-31 (internal citations and quotation marks omitted); *see also id.* at 437 ("Plaintiffs bear the burden of showing that Defendants' unconstitutional conduct violated clearly established law." (citation omitted)).

To be considered clearly established, "a legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.* "There does not need to be 'a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Stated another way, an officer's conduct violates clearly established law "when, at the time of the challenged conduct, the contours

of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Id.*

## III.    ANALYSIS

### A.    Unlawful Seizure and False Arrest

In Count III of the Amended Complaint, Plaintiffs allege Wesley was unlawfully detained and arrested at the scene by Sergeant Foster and Deputy Sharpe, and that he was further unlawfully seized at the Coffee County Sheriff's Department police station by Sheriff Partin, Sergeant Foster and Deputy Sharpe, in violation of his rights under the Fourth Amendment to the United States Constitution.

The Fourth Amendment (applicable to state actors through the Fourteenth Amendment) protects individuals against "unreasonable searches and seizures."  U.S. Const. amend IV.  A seizure of a person "can take the form of physical force or a show of authority that in some way restrains the liberty of the person."  *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (alteration, quotation marks, and citation omitted).  "As the 'ultimate touchstone of the Fourth Amendment is reasonableness,' courts have recognized several situations where police officers can act without first obtaining a warrant for a search or seizure."  *Baker v. Smiscik*, 49 F. Supp. 3d 489, 495 (quoting *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010)).

"Exigent circumstances" are an exception to the warrant requirement that justify the warrantless seizure of a person.  Exigent circumstances "arise when an emergency situation demands immediate police action that excuses the need for a warrant."  *Johnson*, 617 F.3d at 868.  "The exception enables law enforcement officers to handle 'emergenc[ies]'—situations presenting a 'compelling need for official action and no time to secure a warrant.'"  *Williams*, 9 F.4th at 431 (quoting *Lange v. California*, 141 S. Ct. 2011, 2017 (2021)).

13

The Sixth Circuit has "repeatedly recognized four situations that may rise to the level of exigency," including: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *Johnson*, 617 F.3d at 868. Defendants argue the circumstances at the scene presented a sufficient risk of danger to the "officers, emergency personnel at the scene, family members present, and Mr. Pryor himself" to reasonably justify Sergeant Foster and Deputy Sharpe's decision to disarm and detain Wesley [Doc. 39 at Page ID # 371]. Defendants contend Wesley's behavior during that process provided probable cause for his arrest for violation of Tennessee Code Annotated § 39-16-602 (Obstruction of law enforcement; preventing service of process). Defendants further contend they reasonably believed there was probable cause to arrest Plaintiff for violation of Tennessee Code Annotated § 39-17-305 (Disorderly conduct).

The Court agrees with Defendants that, even viewing the facts in the light most favorable to Plaintiffs, it was reasonable for the officers to conclude there were exigent circumstances sufficient to disarm and temporarily detain Wesley. From the moment Wesley arrived at the scene, he was distraught and angry. Other members of his family were likewise in an emotional state. Stella was "screaming and crying." [Doc. 48-3 at Page ID # 517 (Stella Depo.)]. Suzanne was "upset." [Doc. 48-2 at Page ID # 503 (Suzanne Depo.)]. Wesley was loudly criticizing the mental health treatment his brother received at Centerstone. Although Wesley denies using profanity when criticizing Centerstone, Suzanne testified that he did [*id.* at Page ID # 505]. Regardless, when Sergeant Foster instructed Wesley to "shut his mouth," Wesley immediately began cursing at Sergeant Foster and flailing his arms. Wesley proclaimed that he did not have to follow any directions given by Sergeant Foster (the supervising officer at the scene) because he was on his own property. But the officers testified they did not know that Wesley actually owned the property,

14

and it is undisputed that he did not reside there. Deputy Sharpe tried to calm Wesley down, but Wesley admitted he was unable to calm down. Throughout this increasingly tense standoff, Wesley had ready access to a gun in a holster on his hip.

Although not explicitly discussed by the parties as such, it appears Defendants are alleging the officers were acting pursuant to the "community caretaking" exception to the requirements of the Fourth Amendment. "No Fourth Amendment violation results when an immediate caretaking interest justifiably compels an officer's intrusions." *United States v. Brown*, 447 F. App'x 706, 710 (6th Cir. 2003). Community caretaking functions "may come into play when there is a risk of danger to the police or others, and may, therefore, be properly classified as an example of exigent circumstances." *Kent v. Oakland Cnty.*, No. 13-cv-15003, 2014 WL 12685942, at *4 (E.D. Mich. Oct. 28, 2014) (citations omitted) (son of deceased man tasered when firefighters attempted to resuscitate deceased man against his stated wishes; son refused to calm down because "it was his home and he would not let his dead father be assaulted"; finding community caretaking may have justified the seizure of the son but not the amount of force applied during the seizure).

Plaintiffs make much of the fact that the officers were aware of the gun prior to the time that they disarmed and detained Wesley. They cite *Carlson v. Fewins*, 801 F.3d 668, 674 (6th Cir. 2015), which makes the commonsense observation that, "[w]hen police initiate action after a long delay with no new provocation, the delay itself may suggest an unreasonable evasion of the Fourth Amendment rather than a reasonable response to a dynamic threat." That case is readily distinguishable. There, the police "maintained the siege of the [suspect's] house all night without seeking a warrant." *Id.* at 672. In reversing the dismissal of the case, the Sixth Circuit described the district court as relying "on a broad finding of **perpetual exigency**." *Id.* at 674 (emphasis added); *see also O'Brien v. City of Grand Rapids*, 23 F.3d 990, 998 (6th Cir. 1994) ("[T]he fact

that the officers waited four-and-a-half hours before deciding to use the first probe belies defendants' claim that exigent circumstances existed that prevented them from seeking a warrant."). By contrast, in this case, it appears the entire incident lasted a matter of minutes and certainly well under an hour [*see* Doc. 48-7 at Page ID # 590 (incident report indicating incident lasted 28 minutes); *see also Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555, 566 (6th Cir. 2006) ("The police's decisions to wait for backup for an hour and to gather intelligence and execute a plan for another hour and twenty-four minutes did not terminate the exigency.")].

Moreover, it is undisputed that Sergeant Foster initially planned to leave the scene to investigate a car accident, but changed his mind when it became apparent that Wesley was unable to calm down. Deputy Sharpe also testified that the officers would have behaved differently if Wesley would have calmed down [Doc. 48-6 at Page ID # 545 (Sharpe Depo.)]. In other words, the circumstances **did** change as time passed.

Plaintiffs also argue the exigency was removed once the officers had disarmed Wesley, which occurred just prior to the take-down. It is not necessary to dwell on this argument because nothing in the record suggests that no reasonable officer would have briefly detained Wesley after disarming him because of the hostile verbal exchange that occurred moments earlier, Wesley's emotional state, the emotional state of his family members, and the fact that there was an ongoing investigation of a death. *See Shoup v. Doyle*, 974 F. Supp. 2d 1058, 1075-77 (S.D. Ohio 2013) (objectively reasonable for officer to seize and detain uncooperative individual at scene of burglary, "in order to prevent further harm to her or anyone else"); *Barker*, 49 F. Supp. 3d at 497 ("Given a risk of danger to the police or others[,] . . . it was objectively reasonable for the officers to take the limited action that they did: disarm Plaintiff and detain him temporarily while they

16

investigated whether he presented a risk to others, or possibly to himself." (quotation marks and citation omitted)).   Sergeant Foster testified:

> My job is to get the weapon off and detain him before something else would escalate.  I was afraid that he was going—I was afraid that maybe he was going down to the scene and cause a disturbance down there.  I did not want him to go the way he was acting and the unsecured gun on his side, for officer safety, for my safety, and other officers, and other people's safety.

[Doc. 38-5 at Page ID # 266 (Foster Depo.)].  He further explained that he did not simply ask Wesley to hand over the gun because of Wesley's angry emotional state.  Even though Wesley had not directly made any threats, did not reach for his gun, and there was nothing to suggest Wesley's possession of the gun was illegal, Wesley admits he was unable to calm down and he openly told Sergeant Foster to leave the scene, and further that, "I don't have to do a damn thing." [Doc. 48-1 at Page ID # 444 (Wesley Depo.)].   "[P]olice officers are not required "to wait for a potentially dangerous situation to escalate into . . . violence in order to intervene."  *Johnson*, 617 F.3d 864. Defendants concede the continued detainment ripened into an arrest requiring probable cause, which the Court addresses in more detail below.

Plaintiffs cite *Northrup v. City of Toledo Police Department*, 785 F.3d 1128, 1132 (6th Cir. 2015).  In that case, the plaintiff, Northrup, was walking down a public sidewalk with his wife and their daughter, grandson, and dog, with Northrup openly carrying a handgun.  A passing motorcyclist observed the gun, and commented to Northrup, "You can't walk around with a gun like that!"  *Id.* at 1130.  Northrup responded that, in fact, it was legal to do so in Ohio, and that he had the proper permit.  The motorcyclist then called 911 (and apparently left the scene), and an officer was dispatched.  The officer disarmed Northrup, and after an exchange, threatened to arrest Northrup for inducing panic.  *Id.*  The officer then handcuffed Northrup and detained him in his

police car. Northrup was charged with "failing to disclose personal information," but the charge was later dropped. *Id.*

Northrup sued, arguing his Fourth Amendment rights were violated. The officer defended on the basis that he had reasonable suspicion "that Northrup was engaged in criminal activity based on two undisputed facts: (1) Northrup was visibly carrying a gun on his holster, and (2) [the officer] was responding to a 911 call." *Id.* at 1131. The officer's position was that this "reasonable suspicion . . . justified his disarmament, detention, and citation of Northrup." *Id.*

The Sixth Circuit held the officer was not entitled to qualified immunity, noting there had to be specific and articulable facts that Northrup "may have been 'armed and dangerous.'" *Id.* at 1132. The court noted Northrup's carrying of the gun was legal, and there was no reason to suspect the gun was not legal or that Northrup was otherwise engaged in criminal activity.

The instant case is distinguishable. The officers did not encounter Wesley on a pleasant walk with his family and his dog. They encountered him at the scene of the shocking death of his brother, in an angry and distraught state, unable to calm down despite their requests and orders to do so, dealing with other distraught family members, and eventually engaged in a hostile verbal dispute with the supervising officer at the scene in which he declared he was not required to follow police instructions. Moreover, as discussed below, the officers had reasonable suspicion, and even probable cause to believe that Wesley had engaged or was engaging in disorderly conduct in violation of Tennessee Code Annotated § 39-17-305. The officers did not go to Newt Vanattia Road to investigate Wesley, as the officer did in *Northrup*—they were already lawfully present to secure the scene and investigate the death, and once there, they were undisputedly distracted and

18

prevented from performing those tasks by Wesley's behavior and demeanor.[3]  Undoubtedly the situation was unusual and tense for everyone involved.  It simply cannot be said that "no reasonably competent official would have concluded that the actions taken" in disarming and temporarily detaining Wesley "were []lawful."  *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

Moreover, even if the officers did violate Wesley's Fourth Amendment right to be free from unreasonable seizure, the Court finds Plaintiffs have not shown that the right was clearly established, given the unusual and difficult circumstances of the instant case.  The closest case Plaintiffs cite is *Northrup*, and the Court concludes it is simply too factually different to put any reasonable officer on notice that their conduct under the circumstances of this case was unconstitutional.

As Defendants concede, however, the officers must have had probable cause to justify their continued detention of Wesley.  Defendants contend there was probable cause to arrest Wesley for disorderly conduct in violation of Tennessee Code Annotated § 39-17-305.  They also contend that Wesley's behavior during his initial detention created probable cause for his arrest for  obstructing law enforcement (i.e., resisting detention), in violation of Tennessee Code Annotated § 39-16-602.

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  To determine whether an arrest was supported by probable cause, the Court "must determine whether, at the time of the arrest, the 'facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy

---

[3] The Court acknowledges Sergeant Foster's testimony that Wesley's actions did not interrupt the work of the investigators or EMS [Doc. 48-7 at Page ID # 565 (Foster Depo.)].

information were sufficient to warrant a prudent' person to conclude that an individual either had committed or was committing an offense." *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "This inquiry requires a court to examine the events leading up to the arrest and then to decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amounted to probable cause.'" *Id.* (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Courts use a totality of the circumstances test. *Id.*

"Probable cause requires officers to 'show more than mere suspicion . . . [but] does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence to establish guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998)). "All that is required is a 'reasonable ground for belief of guilt.'" *Howard v. Smith Cnty.*, No. 2:10-0009, 2010 WL 4361486, at *7 (M.D. Tenn. Sept. 19, 2011) (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)).

In Tennessee, disorderly conduct is defined as follows:

> (a) A person commits an offense who, in a public place and with intent to cause public annoyance or alarm:
>
>> (1) Engages in fighting or in violent or threatening behavior;
>>
>> (2) Refuses to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency; or
>>
>> (3) Creates a hazardous or physically offensive condition by any act that serves no legitimate purpose.
>
> (b) A person also violates this section who makes unreasonable noise that prevents others from carrying on lawful activities.
>
> (c) A violation of this section is a Class C misdemeanor.

Tenn. Code Ann. § 39-16-602.

20

The Court agrees the officers had probable cause to detain and arrest Wesley for disorderly conduct, pursuant to subsection (b).[4]  Even viewing the facts in the light most favorable to Plaintiffs, the officers can reasonably be said to have had more than "mere suspicion" that Wesley was making "unreasonable noise that prevents others from carrying on lawful activities."  *See State v. Moore*, No. 03C01-9904-CR-00133, 1999 WL 1125235, at *2 (Tenn. Crim. App. Dec. 9, 1999) (evidence sufficient to convict for disorderly conduct where defendant was "very agitated," "talking in a high tone of voice," and "became very belligerent [and] started yelling get off my F'ing property" to officers, preventing them from continuing investigation).  As to whether the noise was "unreasonable," as described above, it is undisputed that Wesley was angry, distraught, and loud.  He used profane language directed at Sergeant Foster several times.  Further, it is undisputed that Deputy Sharpe was tasked with securing the area, including by carefully observing the surroundings.  He started walking toward the area where the death investigator and EMS workers were when the "commotion" pulled his attention away from these tasks.  It can hardly be disputed that Wesley's behavior interrupted and distracted Deputy Sharpe to the point that he was "prevented" from performing his assigned duties.  Plaintiffs contend "there is no proof in the record that anymore investigation was necessary," but Deputy Sharpe clearly testified his role included more than taking witness statements.

The cases Plaintiffs cite do not change the Court's analysis.  *Hutten v. Knight*, No. 3:10-cv-00105, 2012 WL 246302, at *5 (M.D. Tenn. Jan. 26, 2012) involved a consideration of subsection (a)(1).  Likewise, in *State v. Roberts*, 106 S.W.3d 658, 663 (Tenn. Ct. App. 2002), it is

---

[4] Defendants argued the officers also had probable cause to arrest Wesley under other subsections of Tennessee Code Annotated § 39-16-602 [*see* Doc. 39 at Page ID # 373].  It is not necessary for the Court to decide whether the officers had probable cause under any other subsection, however, and the Court declines to do so.

21

apparent the court also considered only section (a), as evidenced by the court's citation to *State v. Creasy*, 885 S.W.2d 829, 831 (Tenn. Crim. App. 1994), which expressly only considered section (a). In *Williams v. Pyle*, No. 3:12-01273, 2014 WL 2440767, at *8 (M.D. Tenn. May 30, 2014), there was a clear factual dispute as to whether the plaintiff (who had been charged with disorderly conduct), actually interfered with the firefighters' duties. The plaintiff asserted she had been given permission by a firefighter to break a car window (to rescue a trapped infant), but a paramedic told police the plaintiff was "interfering with the [fire department's] rescue scene." *Id.* at *1. The plaintiff "vigorously dispute[d]" the paramedic's "characterization of her behavior." *Id.* Finally, Plaintiff relies on *Roberts* to analogize *D.D. v. Scheeler*, 645 F. App'x 418, 420-26 (6th Cir. 2016)—which involves an Ohio statute—to the facts of this case, but it is plainly distinguishable.

Moreover, even if the officers did violate Wesley's Fourth Amendment rights in arresting him, the Court finds Plaintiffs have not shown that the law clearly established that an arrest for disorderly conduct was without probable cause under the circumstances of this case.

Finally, in their response brief, Plaintiffs assert that the interaction in Sheriff Partin's office constitutes an additional seizure which violated Wesley's Fourth Amendment rights. Sheriff Partin testified that while Deputy Sharpe was driving Wesley to the jail to be booked, Sheriff Partin decided to "override the arrest" and instructed Deputy Sharpe to take Wesley to his office instead of into booking [Doc. 48-8 at Page ID #595 (Partin Depo.)]. Sheriff Partin explained that he decided to override the arrest after speaking with Stella and other officers at the scene. He testified that "this is a family that's upset and that this was a brother that has arrived on the scene, has probably got some mental health issues. That's when I made a radio call or phone call or something to Foster and say, 'Hey, y'all don't take him to booking.'" [Doc. 38-7 at Page ID # 316 (Partin Depo.)]. Plaintiff does not cite to any authority suggesting that the interaction in Sheriff

22

Partin's office should be considered a separate seizure, as compared to a continuation of the earlier arrest which remained supported by probable cause, and so the Court declines to address this issue further given the current record and presentation of argument by the parties. *See Estate of Barnwell v. Grigsby*, 801 F. App'x 354, 372 (6th Cir. 2020) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997))).

In sum, the Court finds the officers are entitled to qualified immunity for their initial detention of Wesley, based on the exigency of the circumstances as well as based on reasonable suspicion that Wesley had committed or was committing disorderly conduct. Moreover, the officers had probable cause to believe Wesley had committed or was committing disorderly conduct, justifying their arrest and continued detention of Wesley. For these reasons, Count III of the amended complaint [Doc. 19] will be dismissed.

Because the officers had probable cause to arrest Wesley for disorderly conduct, it is not necessary for the Court to determine whether the officers also had probable cause to arrest Wesley for obstruction of law enforcement (Tenn. Code Ann. § 39-16-602). The Court does address Wesley's alleged resistance (i.e., obstruction) in the context of Plaintiffs' excessive force claims, below.

**B.     Excessive Force**

In Count I, Plaintiffs allege Wesley's Fourth Amendment right (applicable to state actors through the Fourteenth Amendment) to be free from excessive force was violated during the May 24, 2019 incident. In their amended complaint, Plaintiffs seemingly claim that Sergeant Foster, Deputy Sharpe, *and* Sheriff Partin each used excessive force on Wesley, but the amended complaint does not allege any use of force by Sheriff Partin at all [*see* Doc. 19 at Page ID # 105-

08].  Moreover, the parties' briefing addresses only alleged uses of excessive force by Sergeant Foster and Deputy Sharpe.  Accordingly, the Court will address Plaintiffs asserted individual liability excessive force claims against Sergeant Foster and Deputy Sharpe.

All claims that "law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Anderson v. City of Fulton*, No. 21-5001, 2021 WL 43544956, at *2 (6th Cir. Sept. 24, 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989).  It is an objective standard, under which the Court must consider "whether 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"  *Godawa v. Byrd*, 798 F.3d 457, 464 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 397).  "This analysis entails a balancing of the following three factors articulated by the Supreme Court in *Graham*: '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Id.* (quoting *Martin v. City of Broadview*, 712 F.3d 951, 958 (6th Cir. 2013)).

Officers have the "right to use some degree of physical coercion or threat thereof" to effectuate an investigatory stop or an arrest.  *Graham*, 490 U.S. at 396.  Furthermore:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .  Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396-97 (internal quotation marks and citations omitted).

24

The Court finds there are material facts in dispute regarding whether the officers used excessive force at any point, which means the officers are not entitled to qualified immunity on the current record on Plaintiffs' excessive force claims. The officers claim Wesley was resisting their detention of him from the moment they disarmed him, and that he continued to resist their efforts to handcuff and subdue him. Plaintiffs claim Wesley was taken down without warning or instruction or opportunity to put his hands behind his back, and that, essentially, the officers were preventing him from complying with their orders once he was on the ground. He explains his movements were reflexive reactions from the pain the officers were unnecessarily inflicting on him.

The video does not show the moments leading up to the take-down nor does it show the take-down itself. The video apparently shows most of the struggle on the ground and part of the walk to the patrol car. Even though it appears that Plaintiffs may have exaggerated the extent of the force—at least that shown on the video—the angle makes it difficult to determine what Deputy Sharpe is doing, and Deputy Foster's actions are obscured. The verbal exchange is also difficult to understand. The Court concludes the video does not so blatantly contradict Plaintiffs' version of events such that the Court concludes Plaintiffs' claims of excessive force are simply beyond belief based on the video. *See Scott v. Harris*, 550 U.S. 372 (2014) (holding that the plaintiff's version of events was "utterly discredited" by a videotape of the incident where there were no allegations that the video was doctored or altered).

Suspects and arrestees have a clearly established right to be "free from the use of physical force" when they are "not resisting police efforts to apprehend [them]." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (citing *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F. 3d 505, 509 (6th Cir. 2012)). Here, there is also a dispute as to whether Wesley was resisting

25

the officers' efforts to detain and arrest him, rendering summary judgment inappropriate. This distinguishes the case from *Mitchell v. Morristown*, No. 2:07-CV-146, 2012 WL 2501102, at *5 (E.D. Tenn. June 28, 2012), cited by Defendants, in which this Court granted summary judgment to the defendant officers, reasoning, "it is beyond dispute that Mitchell failed to submit to the authority of the police officers when they arrested him." The other *Graham* factors do not weigh so heavily in Defendants' favor as to justify their use of force under the circumstances, given the clear rule regarding the use of force on non-resisting suspects or arrestees, as expressed in *Eldridge*.

Wesley was handcuffed during each of the remaining alleged uses of force, and the law is "clearly established that an officer may not use additional gratuitous force once a suspect has been neutralized." *Alkhateeb v. Charter Township of Waterford*, 190 F. App'x 443, 452 (6th Cir. 2006) (citing *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002)). Defendants do not address Plaintiffs' allegation that Sergeant Foster slapped and scratched Wesley in the chest while escorting him to the patrol car. Nor do they address Plaintiffs' allegation that Deputy Foster slammed on his brakes while driving to the police station causing Wesley to hit his head on the back of the cage. A jury will have to determine whether these incidents occurred in the manner described by Plaintiffs, and if so, whether the officers' actions were reasonable. *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513 (6th Cir. 2006) (A "slap to the face of a handcuffed suspect—even a verbally unruly suspect—is not a reasonable means of achieving anything more than perhaps further antagonizing or humiliating the suspect." (citation omitted)).

Defendants do address Wesley's assertion that when the officers put him in the patrol car, Sergeant Foster pushed him backwards causing him to hit his head, then they closed the car door on his toe and left him in that position for 20 minutes, laughing when he begged them to release

26

his toe.  Defendants contend Wesley had previously been resistant, and furthermore, Wesley did not have a right to "to enter police cars unaided or untouched before officers provide assistance." [Doc. 39 at Page ID # 381].

Even if Defendants were correct on the facts (which are disputed) regarding entry to the patrol car, Plaintiffs essentially contend that the officers were aware that Wesley's toe was caught in the door and chose to let Plaintiff suffer for 20 minutes before releasing him.  The cases Defendants cite are therefore distinguishable.  *See McColman v. St. Clair Cnty.*, 479 F. App'x 1, 6-7 (6th Cir. 2012) (granting qualified immunity to officer when suspect undisputedly required assistance in getting into the patrol car and officer had good reason not to remove her handcuffs; also granting immunity to officer for his positioning in the police vehicle where officer reasonably believed suspect could not fit her prosthetic legs in the car in any other position); *Toner v. Village of Elkton*, 547 F. App'x 720, 728 (6th Cir. 2013) (finding no excessive force where suspect was "visibly intoxicated," and admitted officer was "helping" him into the police car).

In summary, the Court finds there are disputed questions of material fact regarding Plaintiffs' claims of excessive force.  Defendants' motion will be denied as to these claims.

### C.   Substantive Due Process

Defendants moved for summary judgment on Plaintiffs' substantive due process claims related to excessive force and unreasonable seizure [*see* Doc. 39 at Page ID # 383].  In their response, Plaintiffs appear to concede these claims are properly brought under the Fourth Amendment, not as separate claims for violations of their substantive due process rights [Doc. 50 at Page ID # 643-44].  Plaintiffs contend, however, that they also stated substantive due process claims related to Defendants' denial of medical care to Wesley.  In reply, Defendants argue Plaintiffs did not state a claim for denial of medical care, and further, that any such claim fails as

a substantive matter because Plaintiffs did not demonstrate "the existence of a 'sufficiently serious' medical need." [Doc. 55 at Page ID # 660-61 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994))].

Neither party cites a single authority regarding pleading standards, nor do they address the applicability of recent, published Sixth Circuit caselaw regarding pretrial detainee denial of medical care claims. *See Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585 (6th Cir. 2021). Moreover, Defendants did not move for dismissal or summary judgment of any medical care-related claims, as they addressed these alleged claims for the first time in reply, which may be understandable given that they claim they were unaware such a claim was being presented.

The Court declines to address whether Plaintiffs have stated a claim for denial of medical care in violation of the Fourteenth Amendment in the context of Defendants' motion for summary judgment or whether Plaintiffs have demonstrated a sufficiently serious medical need. *See R Gang Inc. v. Hofstetter*, No. 3:15-CV-39-TAV-CCS, 2015 WL 11109238, at \*5 n.2 (E.D. Tenn. Aug. 14, 2015) (citing *Malin v. JPMorgan*, 860 F. Supp. 2d 574, 577-78 (E.D. Tenn. 2012) (declining to address issue raised for the first time in a reply brief "as a matter of litigation fairness and procedure"); *Ritchie v. Coldwater Cmty. Sch.*, 947 F. Supp. 2d 791, 806-07 (W.D. Mich. 2013) ("Case law is legion for the proposition that it is generally improper for a litigant . . . to present a new, previously available argument for the first time in a reply brief.")).

Nevertheless, to the extent Plaintiffs assert substantive due process claims based on the excessive force and unreasonable seizure claims addressed above, such claims will be dismissed given Plaintiffs' concession these claims are properly brought under the Fourth Amendment, not as separate claims for violations of their substantive due process rights.

### D. Failure to Intervene

Defendants move for summary judgment on Plaintiffs' failure to intervene claim(s) solely on the basis that there were no underlying constitutional violations. The Court agrees that any failure to intervene claim predicated on a claim dismissed in this Memorandum and Order is no longer viable. *Craft v. Billingslea*, 459 F. Supp. 3d 890, 912 (E.D. Mich. 2020) ("[A]s there was no constitutional violation, the other officers present cannot be held on a failure to intervene claim."). The Court will grant Defendants' motion as to these claims.

However, at least some of Plaintiffs' federal claims survive summary judgment. Because Defendants advance no other basis for dismissing the failure to intervene claims associated with these claims, the Court will deny the motion for summary judgment to the extent it seeks dismissal of any asserted failure to intervene claims associated with the surviving claims.

### E. State Law Claims

#### 1. Liability of Coffee County

Defendants claim Coffee County is immune from any negligence-based state law tort claims pursuant to the GTLA. The GTLA provides that "all governmental entities," including counties, shall be immune from suit for any injuries which may result from the activities of such governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a). Although the GTLA removes county immunity for "injury proximately caused by a negligent act or omission of any employee within the scope of his employment," county immunity is restored when the negligence action is based on an alleged violation of civil rights, including for negligence-based § 1983 claims. *See* Tenn. Code Ann. § 29-20-205(2); *Barbieri v. Knox Cnty.*, No. 3:15-CV-146-TAV-CCS, 2016 WL 154098, at *4 (E.D. Tenn. Jan. 12, 2016).

29

Defendants acknowledge Coffee County may be liable "for injuries caused by actions that were 'non-negligent'" pursuant to Tennessee Code Annotated § 8-8-302 [Doc. 39 at Page ID # 391]. This statute provides:

> Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

Tenn. Code Ann. § 8-8-302; *see also Barbieri*, 2016 WL 154098, at *5 ("While immune under the GTLA, Knox County can be liable for its deputies' alleged non-negligent tort actions under section 8-8-302."). In this case, Plaintiffs assert claims non-negligence claims of battery and false arrest. Plaintiffs also assert a claim for negligent use of force.

Plaintiffs do not appear to dispute Defendants' position that Coffee County is immune from liability for any negligence-based claims. Moreover, as explained below, the Court finds Defendants are entitled to summary judgment regarding Plaintiffs' state law false arrest claims. Defendants' motion will therefore be granted as to Second Count IV: Liability for Actions of Sheriff's Deputies to the extent it is based on Plaintiffs' negligent use of force and false arrest tort claims.

Defendants do not argue any other reason why Coffee County could not be held liable, as a matter of law, for Plaintiffs' injuries arising from the state law battery claims to the extent the battery claims survive summary judgment. *See Barbieri*, 2016 WL 154098, at *5. Accordingly, the Court will deny the motion to the extent it seeks to relieve Coffee County of liability as a matter of law related to Plaintiffs' surviving battery claims on the current record.

### 2. Liability of the Officers

#### a. Battery & Negligent Use of Force

Plaintiffs' state law battery claims and claims for negligent use of force are analyzed using the same principles as Plaintiffs' § 1983 excessive force claims. *See Griffin v. Hardwick*, 604 F.3d 949, 956 (6th Cir. 2010) ("Where a plaintiff asserts a battery claim under Tennessee law that arises out of the same use of force as her § 1983 excessive-force claim, the analysis is the same for both causes of action."); *Adams ex rel. K.E. v. Blount Cnty.*, No. 3:17-CV-313, 2019 WL 1233750, at *23 (E.D. Tenn. Mar. 15, 2019) (holding that the standard for negligent use of force claims "is substantially similar to, if not identical, to the standard for use of force under the Fourth Amendment.") (citing *Butler v. City of Englewood*, No. 1:07-CV-184, 2008 WL 4006786, at *13 (E.D. Tenn. Aug. 25, 2008)).

Accordingly, consistent with the Court's findings on the federal excessive force claims, the Court finds there are material facts in dispute regarding Plaintiffs' battery and negligent use of force claims, and Defendants' motion for summary judgment will be denied as it pertains to these claims.

#### b. False Arrest

"The absence of probable cause is . . . essential" to Plaintiffs' "state and federal claims" arising from Wesley's allegedly false arrest. *See Blakemore v. Roberson*, No. 3:17-cv-458, 2019 WL 4601516, at *4 (E.D. Tenn. Sept. 23, 2019) (citations omitted). As discussed in detail above in connection with the related federal claims for unreasonable seizure, the Court finds the officers had probable cause to arrest Wesley for disorderly conduct. Accordingly, Plaintiffs' state law claim(s) for false arrest must also be dismissed.

### 3. Loss of Consortium

Defendants argue Suzanne's claim for loss of consortium should be dismissed because Defendants are entitled to summary judgment on Plaintiffs' other state law claims, and because "there is no loss of consortium claim under § 1983." [Doc. 39 at Page ID # 394 (quoting *Mitchell v. City of Morristown*, No. 2:07-CV-146, 2012 WL 2501102, at *9 n.9 (E.D. Tenn. June 28, 2012))]. Plaintiffs concede "that a loss of consortium claim asserted under Section 1983 only, is barred . . . ." [Doc. 39 at Page ID # 652]. However, the Court has concluded, as argued by Plaintiffs, that Defendants have not shown they are entitled to summary judgment on Plaintiffs' battery/negligent use of force claims, as discussed above. As Defendants did not address whether Suzanne may have a viable claim for loss of consortium relating to these claims, the Court declines to do so.

## IV. CONCLUSION

Defendants' motion for summary judgment [Doc. 38] is **GRANTED IN PART AND DENIED IN PART**:

For the reasons set forth above,

1. regarding Court I – Excessive Force, Count VI – Negligent Use of Force, and Count VII – Battery, the motion is **DENIED**;

2. regarding Count II – Failure to Intervene, the motion is **DENIED** to the extent the failure to intervene claims are based on the surviving federal excessive force claims, or any other federal claim not dismissed herein, and the motion is **GRANTED** as to any failure to intervene claims based on the claims being dismissed herein, and any such failure to intervene claims are **DISMISSED**;

32

3. regarding Count III – Unlawful Seizure and False Arrest and Count VIII – False Arrest (state law), the motion is **GRANTED** and these Counts are **DISMISSED**;

4. regarding Count IV – Substantive Due Process, the motion is **GRANTED** as to any substantive due claims based on unreasonable detention/false arrest or excessive force, and these claims are **DISMISSED**;

5. regarding Count V – Failure to Train & Supervise and Custom of Defendant Coffee County and Second Count V – Civil Conspiracy, the motion is **GRANTED** and these Counts are **DISMISSED**;

6. regarding Second Count IV – Liability for Actions of the Sheriff's Deputies, the motion is **GRANTED** to the extent Plaintiffs seek to hold Coffee County liable for injuries arising from any negligence-based state law claims, and the motion is **DENIED** as to any surviving non-negligence-based state law claims;

7. regarding Second Count VII – Plaintiff Suzanne Drivas Pryor's Loss of Consortium, to the extent Plaintiffs seek to hold Defendants liable for loss of consortium based on § 1983 claims, the motion is **GRANTED,** and the motion is **DENIED** as to any loss of consortium claims based on surviving state law claims.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE