UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

WESLEY PRYOR, *et al.*,                    )
                                           )
        Plaintiffs,                        )
                                           )
v.                                         )        No. 4:20-cv-00014-SKL
                                           )
COFFEE COUNTY, TENNESSEE, *et al.*,        )
                                           )
        Defendants.                        )

**MEMORANDUM AND ORDER**

This is a civil rights action filed pursuant to 42 U.S.C. § 1983 with related state law tort

claims.   Plaintiffs Wesley Pryor ("Wesley") and Suzanne Drivas Pryor ("Suzanne," and

collectively, "Plaintiffs"[1]) assert claims against Defendants Coffee County, Tennessee (the

"County" or "Coffee County"); Deputy Michael Sharpe; Sergeant Dustan Foster; and Sheriff Chad

Partin (collectively, "Defendants").   Currently before the Court is Plaintiffs' motion in limine

[Doc. 59], which is accompanied by a supporting brief [Doc. 60].  Defendants filed a response in

opposition [Doc. 65], and Plaintiffs filed a reply [Doc. 71].  This matter is now ripe.

I.      **ANALYSIS**

        The Court presumes familiarity with the facts of this case, which are set forth in detail in

the Court's recently-issued memorandum and order on Defendants' motion for summary judgment

[Doc. 64].  The Court dismissed Plaintiffs' federal and state law counts related to unreasonable

seizure/false arrest, civil conspiracy, and municipal liability [Doc. 64 at Page ID # 871-72].  A

---

[1] Because there are a number of members of the Pryor family referenced in this Memorandum and
Order, the Court will primarily use their first names.

number of claims remain viable, including those for excessive force and failure to intervene, among others.

Plaintiffs included sixteen in limine requests in their opening motion [Doc. 59]. The parties were able to reach agreements on three [*see* Doc. 66 at Page ID # 878], and those three requests are **DENIED AS MOOT**. Plaintiffs' in limine request nos. 1 through 8, 11 through 14, and 16 are addressed below.

### A.     In Limine Request Nos. 1 & 2 – Wesley's August 2021 Collision and Assault

On August 16, 2021, Wesley was involved in a collision while driving. The driver of the other car, David Adams, "rear ended Mr. Pryor, pushed his pickup truck through the intersection, and then physically assaulted him." [Doc. 60 at Page ID # 722]. In their first and second in limine requests, Plaintiffs move to exclude any reference to either the collision or the assault. They contend they are not seeking damages, "through medical bills or otherwise," relating to this incident [*id.*]. They attach a copy of the police incident report, which describes Wesley's account of the incident as well as the other driver's. Wesley alleged Adams pulled out in front of him, then Wesley passed Adams and slowed down in front of Adams, then Adams rear-ended him. Adams then got out of his truck, approached Wesley's truck, and began hitting Wesley as Wesley tried to open his door. Witnesses observed Adams hitting Wesley repeatedly. Adams alleged that Wesley cut him off twice in a short amount of time, and Adams was unable to stop the second time. Adams was charged with assault [Doc. 59-1].

Wesley apparently had surgery related to the May 24, 2019 incident at issue in this case some time before the altercation with Adams. As a result of the altercation, Wesley had to undergo an additional surgery to make sure "there had not been any changes in the ulnar nerve or the cubital tunnel." [Doc. 59-2 at Page ID # 692].

2

Defendants correctly note that Wesley is making a claim for both physical and emotional injuries as a result of the May 24, 2019 incident at issue in this case. While Plaintiffs state they are not seeking damages for any *treatment* relating to any injuries sustained in the August 2021 incident with Adams [*see* Doc. 60 at Page ID # 722], it is unclear whether Wesley will testify at trial that he is still suffering from hand/arm injuries or limitations related to the May 2019 incident at issue in this case. For example, during his deposition, Wesley testified that he was still experiencing "super weakness" in his wrist as a result of the May 2019 incident [Doc. 48-1 at Page ID # 468-69]. If Wesley testifies at trial that he is still experiencing this limitation, Defendants should be permitted to explore the extent to which this limitation has been impacted by the 2021 altercation with Adams.

Nevertheless, Plaintiffs are correct that the details of the accident as described in the police report and assault citation issued to Adams are not relevant and may have the tendency to confuse the jury. The Court will therefore exclude the police report and assault citation pursuant to Federal Rule of Evidence 403, but on the current record, the Court will not exclude the cited testimony of Dr. Joyner or any related medical records, which, as explained above, may be relevant to the issue of damages. The Court acknowledges Dr. Joyner references that Wesley had been in a "motor vehicle accident that resulted in an altercation" [Doc. 59-2 at Page ID # 692], but this testimony simply provides some minimal context for the injury and is therefore not overly prejudicial.

Accordingly, Plaintiffs' in limine request no. 1 is **GRANTED IN PART AND DENIED IN PART**, and Plaintiffs' in limine request no. 2 is **DENIED.**

### B.     In Limine Request No. 3 – June 2019 Discharge Note

In their third in limine request, Plaintiffs move to exclude any reference to or the introduction of a "Discharge Note," dated June 27, 2019, from Tennova Healthcare, where Wesley

3

had been receiving physical therapy following the May 2019 incident with Defendants [Doc. 60 at Page ID # 723-24]. The Discharge Note states:

> Mr. Pryor discharged himself from therapy after a scene of both hostile and inappropriate sexual comments. Director was contacted by patients in the facility after the situation stating they would not return for therapy unless they were scheduled at a different time than Mr. Pryor. Mr. Pryor had requested that the "boss" contact him. Director contacted Mr. Pryor via phone after conversation with patients and staff. Mr. Pryor argued and denied any wrong doing on his behalf and discharged himself from therapy.

[Doc. 59-3 at Page ID # 695]. The note was written by Kasey Cartwright, PT/CEO, the Director of Tennova Physical Therapy. Plaintiffs contend the note is hearsay.

Defendants "do not contest that the particular circumstances surrounding the discharge-allegations that Wesley Pryor engaged in hostile or aggressive sexual commentary/conduct while at therapy-should be excluded from this trial." [Doc. 66 at Page ID # 880]. Defendants contend, however, the statement that Wesley discharged himself from physical therapy as a result of the "scene" described above indicates Wesley did not properly complete physical therapy, and "failing to complete physical therapy could impede [Wesley's] ability to heal from the injuries he claims to have sustained at the hands of these defendants." [*Id.*]. Defendants contend the statement about Wesley discharging himself is admissible hearsay under Federal Rule of Evidence 803(4) as a statement made for a medical diagnosis or treatment, or under 803(6) as a record of a regularly conducted activity.

The "primary inquiry in applying Rule 803(4) is whether the declarant made his or her statements for the purpose of receiving a medical diagnosis or treatment." *See United States v. Kappell*, 418 F.3d 550, 556-57 (6th Cir. 2005). Defendants have not demonstrated how a statement about Wesley discharging himself from physical therapy is a statement made for the primary

4

purpose of receiving a medical diagnosis or treatment. If anything it is a statement made to terminate medical treatment.

Plaintiffs do not address Defendants' Rule 803(6) argument in their reply, and the Court notes the Discharge Note and the statements within it could be admissible under this exception provided Defendants lay the proper foundation at trial. The "Affidavit Records Custodian" does not provide an adequate foundation, as it discusses only how the *copies* of the medical records were made [*see* Doc. 66-1 ("The copies were prepared by the personnel of Tennessee Orthopaedic Alliance, or persons acting under their control in the ordinary course of business, at or near the time that the request for copes was made.")].

Finally, the Court agrees with Defendants the note and Wesley's decision to discharge himself from physical therapy could be relevant to damages. Contrary to Plaintiffs' argument, the note does suggest that Wesley's course of physical therapy was not complete but rather he decided to terminate it following the accusations from other patients and staff at Tennova.

Accordingly, Plaintiffs' in limine request no. 3 is **DENIED** on the current record, to the extent it seeks to exclude the note itself for all purposes and the statement about Wesley's decision to terminate treatment. The request is **GRANTED** in all other respects. Defendants should be prepared to present a properly redacted version of the document—outside the presence of the jury—and further be prepared to lay a proper foundation for its admission.

### C.      In Limine Request No. 4 – Dr. Sean Kaminsky's Deposition Testimony

In their fourth in limine request, Plaintiffs move to exclude the following testimony from the deposition of Dr. Sean Kaminsky, Defendants' independent medical examiner:

> Q.      And if the findings of the left shoulder and the right shoulder were similar, do you know why Mr. Pryor would have a surgery on his left but not a surgery on the right?

5

A.      I can't tell you for sure, but one reason—or several possible reasons.  He's had previous surgery on his right—

Q.      Object to possibilities.

The Witness: Several potential reasons.  He's had surgery on his right shoulder in the past.  So that—to proceed with the revision surgery requires a little more trepidation.  And he may have complained of left should pain more than right shoulder pain.

. . . .

Q.      You were asked on direct examination based upon some of the test results, Dr. Petersen, I believe, chose to operate on the left shoulder rather than the right.  Do you recall that question?

A.      Yes.

Q.      Your answer was just a guess, wasn't it?

A.      Yeah, I don't know for sure that was a discussion between the physician and the patient.

Q.      So the response you gave to that question would have just been your best guess, but it wouldn't have been to a reasonable degree of medical certainty, would it?

A.      I don't know for sure why the decision was there.  It was just, as a surgeon, what I would typically expect to come to a conclusion.

[Doc. 59-4 at Page ID # 696-99].

Plaintiffs argue that "[b]ased on the speculative nature of Dr. Kaminsky's testimony regarding the decision for the left shoulder surgery, such testimony is inadmissible" under Federal Rules of Civil Procedure 403 and 702 [Doc. 60 at Page ID # 726].  In their response, Defendants argue that Dr. Kaminsky "does not speculate, but rather, openly admits that he does not know the exact reason why Mr. Pryor had surgery only on the left shoulder.  From there, he simply opines that in his professional experience and opinion, there exists several reasons that could support the

6

decision to operate on only the left shoulder. Contrary to Plaintiffs' position, this testimony is not speculative or inadmissible under the Rules of Evidence." [Doc. 66 at Page ID # 880].

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

"[I]t is the long-standing rule of this circuit that for expert testimony to be admissible, there is no 'magic words' test." *Johnson v. Memphis Light Gas & Water Div.*, 695 F. App'x 131, 136 (6th Cir. 2017) (quoting *Thompson v. Underwood*, 407 F.2d 994, 997 (6th Cir. 1969)). "That is, scientific experts need not attach the modifier 'to a reasonable degree of medical certainty' to their opinions to gain admissibility." *Id.* Nevertheless, experts are "not permitted to speculate." *Id.* (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 663, 671 (6th Cir. 2010)). In the context of causation, "for an expert opinion to be helpful to the jury, a doctor need only testify that his conclusion is more likely than not true." *Id.* (citation omitted).

In the testimony quoted above, Dr. Kaminsky is plainly speculating as to why Dr. Petersen operated on one shoulder but not the other. *See Tamraz*, 620 F.3d at 670-71 ("That manganese *could* cause Parkinson's Disease in someone like Tamraz does not show that manganese *did* cause Tamraz's Parkinson's Disease." (emphases in original)).

Accordingly, Plaintiffs' in limine request no. 4 will be **GRANTED**.

**D.     In Limine Request No. 5 – Dr. Kyle Joyner's Deposition Testimony**

In their fifth in limine request, Plaintiffs move to exclude the following testimony from the deposition of Dr. Kyle Joyner, one of Wesley's treating physicians as mentioned above:

> Q.     Okay.  Do—has some of the medical community started coming around to the idea that there is a congenital disposition to carpal tunnel as well?  In other words, some people just have a smaller carpal tunnel or a tunnel that's more prone to carpal tunnel syndrome?
>
> A.     Yes.  That is correct.
>
> Q.     Given Mr. Pryor's fairly extensive history with—with carpal tunnel syndrome and both carpal tunnel and cubital tunnel issues, is it fair to say that you would expect him to, unfortunately, have recurring carpal tunnel symptoms regardless of this event in May of 2019?
>
> A.     It's possible.
>
> Q.     Well, in fact, Mr. Pryor had a right carpal tunnel surgery before May the 24th of 2019; correct?
>
> A.     That is correct.
>
> Q.     And he had a carpal tunnel surgery after the surgery that you performed in 2019; correct?
>
> A.     That is correct.
>
> Q.     The surgery that we discussed in 2021; correct?
>
> A.     That's right.
>
> Q.     And, additionally, he had a prior carpal tunnel surgery and cubital tunnel surgery to his left extremity as well?
>
> A.     That is correct.

[Doc. 59-5 at Page ID # 701-02].

Plaintiffs argue that this testimony should be excluded as speculative, like Dr. Kaminsky's testimony addressed above. They contend, "[T]his line of questioning is misleading to the jury and could tempt them to believe that it was the opinion of Dr. Joyner, to a reasonable degree of medical certainty, that Mr. Pryor had some type of congenital defect, which is not his testimony." [Doc. 60 at Page ID # 727].

Defendants argue Plaintiffs waived their objection under Federal Rule of Civil Procedure 32(d), which provides:

> (d) Waiver of Objections.
>
> . . . .
>
> > (3) To the Taking of the Deposition.
> >
> > > (A) Objection to Competence, Relevance, or Materiality. An objection to a deponent's competence--or to the competence, relevance, or materiality of testimony--is not waived by a failure to make the objection before or during the deposition, unless the ground for it might have been corrected at that time.
> > >
> > > (B) Objection to an Error or Irregularity. An objection to an error or irregularity at an oral examination is waived if:
> > >
> > > > (i) it relates to the manner of taking the deposition, the form of a question or answer, the oath or affirmation, a party's conduct, or other matters that might have been corrected at that time; and
> > > >
> > > > (ii) it is not timely made during the deposition.

The Sixth Circuit has explained the purpose of Rule 32(d) as follows:

> If the objection could have been obviated or removed if made at the time of the taking of the deposition, but was not made, then that objection is waived. The focus of the Rule is on the necessity of

9

making the objection at a point in the proceedings where it will be of some value in curing the alleged error in the deposition. When a party waits until trial to object to testimony in the deposition, the only manner in which to cure the deposition is to bar the objectionable portions from the trial. It is important that objections be made during the process of taking the deposition, so that the deposition retains some use at the time of trial; otherwise counsel would be encouraged to wait until trial before making any objections, with the hope that the testimony, although relevant, would be excluded altogether because of the manner in which it was elicited.

*Bahamas Agr. Indus. Ltd. v. Riley Stoker Corp.*, 526 F.2d 1174, 1181 (6th Cir. 1975).

The parties apparently stipulated that "all objections, except as to the form of the questions, are reserved to the hearing." [*see* Doc. 71-1]. Defendants did not address this stipulation in their response. Plaintiffs did not object to form during the questions at issue, and make no argument as to how the stipulation applies to the questions and answers at issue. Instead, Plaintiffs appear to contend that the sequence of questions and answers might mislead the jurors—something that they could have been clarified in the deposition.

If Plaintiffs had objected to a speculative answer, Defendants could have rephrased the question or, more importantly, either party could have followed up and clarified Dr. Joyner's response. Further, the Court disagrees that the jury could be misled into thinking Dr. Joyner found Wesley had a congenital defect and a careful reading of the testimony does not indicate such. The question was whether, given Wesley's history, Dr. Joyner would expect him to have ongoing carpal tunnel issues even in the absence of the May 2019 incident with Defendants. Dr. Joyner was not asked to speculate as to whether Wesley had congenital issues. Accordingly, Plaintiffs in limine request no. 5 is **DENIED**.

E.    **In Limine Request No. 6 – Wesley's Post-Seizure Statements**

10

In their sixth in limine request, Plaintiffs move to exclude statements made by Wesley "toward the Defendants after he was seized and in custody," which they contend "will be used solely to inflame and prejudice the jury against him." [Doc. 60 at Page ID # 728]. Plaintiffs cite the following statements Wesley testified to in his deposition:

> At the driveway gate, Foster is trying to push the gate out toward street. And I told him, I said, "The gate don't push; it pulls."
>
> And once again, he told me, he said, "I told you to shut your mouth."
>
> And I told him, I said, "I don't have to do a damn thing. I've got a First Amendment right. I can say whatever I want to. Just like your momma can s*** my d***."

[Doc. 60-1 at Page ID # 741-42]. Plaintiffs also cite Wesley's comments while being put in the patrol car. Wesley testified that he told the officers, "My toe is in your freaking door. F****** is actually what I said." [*Id.* at Page ID # 743].

Plaintiffs assert claims for excessive force arising from Wesley's interactions with the officers after he had been handcuffed, in particular for the way the officers handled Wesley as they were putting him in the police car. The jury will have to consider "whether 'the officers' actions are objectively reasonable in light of the facts and circumstances confronting them.'" *Godawa v. Byrd*, 798 F.3d 457, 464 (6th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Furthermore:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

11

*Id.* at 396-97 (internal quotation marks and citations omitted).

Accordingly, Wesley's demeanor is relevant to evaluating the reasonableness of the officers' actions. Wesley's use of inflammatory language is relevant to evaluating his demeanor. Plaintiffs emphasize that no use of force is permitted when a suspect is "not resisting police efforts to apprehend [them]." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (citing *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F. 3d 505, 509 (6th Cir. 2012)). However, Wesley's continued verbal aggression may very well be relevant to evaluating the officers' decisions and behavior in putting Wesley in the patrol car (for example not removing his handcuffs) or any number of other issues. Plaintiffs' in limine request no. 6 is therefore **DENIED** on the current record.

### F.    In Limine Request Nos 7 & 8 – Wesley's Prior Accidents and Lawsuits

In their seventh and eighth in limine requests[2], Plaintiffs move to exclude any evidence, testimony, or reference to accidents or "vehicular collisions" involving Wesley that took place prior to May 24, 2019, including any resulting medical treatment, lawsuits, settlements, or insurance claims. In particular, Plaintiffs cite the following testimony from Wesley's deposition:

> Q.    All right. Have you ever given a deposition before?
>
> A.    Yes.
>
> Q.    Okay. Can you tell me what sort of deposition that was?
>
> A.    It was Research Solvents & Chemicals, from where I was injured at work.
>
> Q.    How long ago was that?

---

[2] Plaintiffs' in limine request no. 7 addresses "prior accidents and vehicular collision" and any related lawsuits or settlements involving Plaintiffs. Their in limine request no. 8 addresses any other lawsuits involving Plaintiffs.

12

A.     Probably 2009, 2010.  It's been a while.

Q.     Okay.  Where were you working at the time?

A.     Research Solvents & Chemicals.

Q.     Okay.  What was the nature of the injury that you were claiming?

A.     Blown disc in the neck.

Q.     Okay.  And how did that happen?

A.     I was pulling a pallet jack and a 350-pound—or gallon tote out of the back of my box truck.  And whenever I went back to close my door, the spring caught and jerked my arm back up in the air.

. . . .

Q.     Did the case ever go to court?

A.     No.

Q.     Was it settled?

A.     Yes.

Q.     Okay.  And do you remember how much it was settled for?

A.     No.

Q.     Was there an impairment rating assigned to your injury?

A.     Yes.

Q.     And what was the impairment rating that you received?

A.     I don't remember.

. . . .

Q.     You said you had an automobile accident claim for an accident on July 2, 2016; is that correct?

A.     Yes, sir.  That's what's listed here.

13

Q.      Was the case settled? Do you recall?

A.      I believe it was in the following year.

Q.      Did you have an attorney represent you in that?

A.      I believe so, for that. I believe so.

Q.      And you don't recall if there was a suit filed?

A.      I don't remember how they actually—I know the insurance company paid it.

Q.      What was the amount of the settlement?

A.      I don't recall.

Q.      What injuries were you claiming in the accident?

A.      I would up having to have a neck surgery. They damaged another disc in my neck, a herniated disc.

Q.      Who did the neck surgery as a result of the July 2, 2016, accident?

A.       Paul McCombs.

. . . .

A.      Dr. McCombs did my left wrist carpal tunnel release. And it was because a lady sideswiped me, and it caught my wrist in the steering wheel and it bent it backwards, which, in turn—whatever that release is. But I don't know.

. . . .

Q.      Was there a lawsuit as a result of the lady sideswiping you?

A.      No, sir.

Q.      Did you make a claim against her?

A.      It was an insurance claim, yes.

Q.      Was it settled?

14

A.      Yes.

Q.      And when was that?

A.      Shortly after the wreck.

[Doc. 60-2 at Page ID # 744-51].  As part of their seventh in limine request, Plaintiffs also move

to exclude the following testimony from Suzanne:

Q.      Have you been involved in any lawsuits in the past ten years
as either a plaintiff or a defendant?

A.      There was that car wreck in 2016, where Wesley said that he
had the blown disc in his neck.  I had injured my back and had to go
through physical therapy for about six months.

Q.      Was there a lawsuit as a result of the July 8, 2016, accident?

A.      It was settled.  So I don't know if that's considered a lawsuit.
We did have a lawyer, though.

Q.      And who was the lawyer?

A.      Bart Durham.

Q.      Was the July 2, 2016, accident the one that happened in
Alabaster, Alabama?

A.      Mm-hmm.  Yes, sir.

Q.      What was the amount of the settlement for the 2016 lawsuit.

A.      I don't know the total.  I know that I received $20,000.

Q.      And what did Mr. Pryor receive?

A.      I have—I don't know.

Q.      And Mr. Pryor told us about another accident that happened
in Smyrna.  Were you involved in that accident?

A.      Yes.

Q.      Okay.  Was there a lawsuit?

15

A.      Again, that one was settled.  They paid for the truck and my—I had medical bills.

Q.      When did the Smyrna accident happen?

A.      2000—either 2017 or 2018.

Q.      Did you have an attorney for that accident?

A.      No.

Q.      Both you and Mr. Pryor made a claim?

A.      With the lady's insurance.

Q.      And there was a settlement paid to you and to Mr. Pryor?

A.      I don't think he got a settlement.  I got $3,000 for the injuries.

Q.      Was Mr. Pryor injured in the Smyrna accident?

A.      I don't remember.

[*Id.* at Page ID # 752-54].  Plaintiffs also mention Wesley's testimony about being involved in a lawsuit regarding a backhoe and a lawsuit involving the sale of a hot tub.

Plaintiffs argue, "[i]t is not disputed that Mr. Pryor had previous surgeries and preexisting conditions, but to present his involvement in previous accidents, insurance claims, or lawsuits is not relevant nor admissible." [Doc. 60 at Page ID # 729].

For the reasons explained in connection with other in limine requests, the Court finds the medical history discussed in the above-quoted testimony is relevant, and his testimony about his past injuries is admissible, as is some context regarding how the injury occurred.  This is consistent with the holdings from the two cases Defendants cite, *Swords v. Transportation Solutions of America, LLC*, No. 2:14-CV-1396, 2016 WL 98592, at *3 (S.D. Ohio Jan. 8, 2016) (holding that defendant would be limited to "introducing evidence of workers' compensation claims for injuries that are related to the injuries that he allegedly sustained in the automobile accident at issue here.

16

Claims for other such injuries are irrelevant."); and *King Joseph X v. Liberty Mutual Group, Inc.*, No. 3:16CV-00642, 2018 WL 691709, at \*5 (W.D. Ken. Feb. 1, 2018) ("The fact that Plaintiff was being treated for similar injuries from another automobile accident and the argument by defense counsel that the injuries claimed in this action were actually pre-existing are proper matters for cross-examination of Plaintiff and his treating physician.").

However, the Court agrees with Plaintiffs that evidence of any past lawsuits or settlements has no bearing on the issues in this case, and would be unfairly prejudicial. Defendants assert that such evidence is admissible to "prove bias and motivation," and to show Wesley might already have been compensated for his current injuries [Doc. 66 at Page ID # 884]. Defendants' concerns about duplicative damages awards are addressed by allowing evidence of Wesley's medical history. Defendants' evidence of Plaintiffs' litigiousness is improper character evidence. *See also Palmer v. Allen*, No. 14-cv-12247, 2017 WL 218077, at \*12 (E.D. Mich. Jan. 19, 2017) (holding that "[a]s a general matter, a plaintiff's litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant.").

Accordingly, Plaintiffs' in limine request no. 7 is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' in limine request no. 8 is **GRANTED**.

### G.    In Limine Request No. 11 – Handwritten Notes

Defendants assert they only intend to offer the handwritten notes from non-party witnesses Stella Pryor and Heather Jones for impeachment purposes, if necessary. The parties agree this is a proper use of the notes. Accordingly, Plaintiffs' in limine request no. 11 is **DENIED.**

### H.    In Limine Requests Nos. 12, 13, & 14 – Wesley's Medical History & Treatment

In their twelfth, thirteenth, and fourteenth in limine requests, Defendants seek to exclude references to certain conditions and treatment in Wesley's medical history. These include Wesley

17

experiencing "shock[s] in his brain" after incurring nerve damage following a previous surgery, his prior and current hydrocodone use, and his treatment at Centerstone for mental health issues in 2008 for approximately six months [Doc. 60 at Page ID # 734-36].

In their opening motion, Plaintiffs sought to exclude "any reference by documents, testimony, or prior testimony," "or any other means" to these issues [*id.*]. In their response, Defendants pointed out that Wesley "has put his physical and mental health at issue in this case, including claims of nerve damage, pain necessitating treatment with medication, and mental anguish," and that the above-listed items in his medical history could "easily be relevant to causation, damages or both." [Doc. 66 at Page ID # 886]. Seemingly agreeing with Defendants, Plaintiffs replied that they are *not* seeking to exclude introduction of this proof through the medical doctors, but only seeking to exclude Wesley's deposition testimony regarding these issues [Doc. 71 at Page ID # 926]. The deposition testimony Plaintiffs seek to exclude provides:

> Q.     So when did you apply for social security disability?
>
> A.     I don't know if it's correct, but I would think it's, like, 2011.
>
> . . . .
>
> Q.     What was the nature of the disability that you listed in order to apply for social security disability?
>
> A.     Limitations, nerve damage, and—
>
> Q.     Was that—I'm sorry. Go ahead. Please finish. I didn't mean to interrupt you.
>
> A.     No. That was it.
>
> Q.     The nerve damage you're talking about, is that in your neck?
>
> A.     Brain.

. . . .

Q.     Okay.   Tell me about the nature of your nerve
damage to your brain.

A.     After the surgery that Shibayama done, apparently—
they're assuming that there was some kind of nerve damage
from where it was collapsed for about a year before they
found out what was wrong.   It caused nerve damage and it
affects my ears.   And it can actually set it off and I can be
electrocuted in the brain, shocked in the brain.
. . . .

Q.     When you say limitations placed against you, what
do you mean by that?

A.     They don't want me doing anything above my head
due to the three surgeries I've had in the front, and the
electrocution, because it—you never know when it's going
to occur.   And due to that, I also have chronic migraines that
just pop up out of the blue, or severe ear infections to just
different weather.

. . . .

Q.     You talked about this electrocution issue.   How often
does that occur?

A.     Probably a couple times a month.

Q.     Are you taking medication for that?

A.     Yes.

Q.     What kind of medication do you take for that?

A.     I take a shot called Emgality in my stomach.   That
helps with that and the migraines.

Q.     When you have this electrocution issue, can you
explain to me what happens to you?

A.     It's the same thing as grabbing a bare wire with your
hand.   It makes you—or makes me now be able to see very
well.   I actually—when it first happened, I actually ran off
the road and went into a ditch.   You shake—or I shake.   And

19

it just hurts really bad until it passes its course, and then it stops.

Q.      How long do these episodes last?

A.      The worst one lasted probably about three minutes.

. . . .

Q.      And how long have you taken that medication, the hydrocodone?

A.      Since 2007.

. . . .

Q.      Is the hydrocodone a medication that your doctor tells you to take a specific amount every day, or is it partially determined by you as to what you think you need on that particular day?

A.      To me.  But there is, like all medications, one every six hours or whatever, or as needed.

. . . .

Q.      Had you ever sought treatment or counseling with a mental health professional prior to May 24 of 2019?

A.      Yes, sir.

Q.      Who did you see?

A.      Centerstone.

Q.      Who did you see at Centerstone?

A.      I don't recall who it—it was the same.  It was like, a psychologist or whatever.

Q.      When did you see a psychologist at Centerstone?

A.      After I lost my job—or after I was terminated from Research Solvents & Chemicals.

> Q.     How many visits, approximately, did you have with Centerstone?
>
> A.     Probably six months, once a month, something like that.  It was one time a month.  I think it was about six months.

[Doc. 60-3, Doc. 60-4, & Doc. 60-5].

First, regarding the testimony about Wesley's hydrocodone use, the Court finds this testimony is relevant and not overly prejudicial.  Plaintiffs are requesting damages for Wesley's pain and suffering.  The fact that Wesley was already taking medication for pain symptoms certainly is relevant to the question of whether Defendants' actions caused his current pain.  The probative nature of the testimony outweighs any prejudice caused by the fact that Wesley has been taking the medication for many years.  *Crankshaw v. CSX Transp., Inc.*, No. 1:11-CV-377, 2014 WL 12576291, at *4 (E.D. Tenn. Mar. 11, 2014) ("evidence of past injury is relevant and admissible if it tends to show CSX is not responsible for Crankshaw's current injury").  In the quoted testimony, counsel for Defendants did not badger Wesley about the hydrocodone or ask any argumentative questions designed to "infer that [Wesley] is addicted to Hydrocodone." [Doc. 71 at Page ID # 927].  Finally, Plaintiffs do not cite to any authority to support their argument that proof of Wesley's long-term hydrocodone use is only admissible through expert medical testimony.  Plaintiffs' in limine request no. 13 is therefore **DENIED**.

Plaintiffs argue Wesley's treatment at Centerstone for mental health issues in 2008 is too remote in time to be relevant.  Defendants do not address the remoteness of this short-term treatment, which was after Wesley lost his job at the chemical company.  The Court agrees this decade-old short-term treatment is not reasonably relevant to Wesley's injuries in this case.  There is no proof or argument that Wesley continued mental health treatment of any kind after completing the six-month treatment at Centerstone.  There is nothing in the record to suggest

21

Wesley still experiences adverse mental health symptoms due to losing his job at the chemical plant, or that he was experiencing adverse mental health symptoms for any reason at the time of the May 2019 incident with Defendants. *See Dziuba v. Smith*, No. 16-cv-10869, 2017 WL 3084375, at *2 (E.D. Mich. July 20, 2017) (declining to exclude most of a plaintiff's medical history because it was "relevant to the injuries" alleged and to damages, but excluding past medical history regarding issues unrelated to current injuries). The Court will therefore **GRANT** Plaintiffs' in limine request no. 14.

Regarding the brain electrocution testimony, Plaintiffs contend there is no evidence in the record that Wesley even has this condition, and the only reasonable purpose for introducing that particular testimony would be "an effort to embarrass or humiliate him." [Doc. 60 at Page ID # 735]. Plaintiffs further contend Wesley has not sought any treatment "for this previously diagnosed nerve condition" related to the May 2019 incident with Defendants [*Id.*]. Plaintiffs characterize Wesley's testimony as Wesley's "attempt to explain how he felt in the past." [Doc. 71 at Page ID # 926].

Wesley's testimony clearly reflects that at the time of his deposition, he was unable to lift objects over his head as a result of his brain issues, and he was still experiencing migraines. Even if he is not specifically seeking treatment for these conditions, particularly the arm-lifting limitation could contribute to any pain and suffering Wesley allegedly experienced following the May 2019 incident, which is relevant to refuting damages. Plaintiffs' in limine request no. 12 is therefore **DENIED**.

I.    **In Limine Request No. 16 – Wesley's Deposition Testimony**

In their sixteenth in limine request, Plaintiffs move to exclude any evidence relating to "unexplained incidences" that occurred at Wesley's home, including the "death of animals," which

Wesley testified about in his deposition [Doc. 60 at Page ID # 737]. Plaintiffs cite the following testimony from Wesley's deposition:

> A.     We've had things happen at our house that no one could find out how it happened.
>
> Q.     What do you mean by that?
>
> A.     After all this came to light, we've had eight animals come up just dead. We've had three come up missing. I've had my truck set on fire and blowed up in my driveway.
>
> Q.     Anything else?
>
> A.     Those are—those are the only things, other than there's cars that I don't know anything about or who they are, they come creeping through. But that could be just about anything.
>
> Q.     Is it your testimony that somebody at the sheriff's department or somebody related to one of the defendants in this case has had anything to do with the animals or the truck being set on fire?
>
> A.     All I can state for a fact is it didn't happen until all of this was brought to light, just like I told the sheriff's department where I live. And their information was given to the sheriff's department. But, yet, they won't tell me if they've talked to any of them.
>
> Q.     Well, who do you believe is responsible for the animals and the truck?
>
> A.     I have no idea. If I believed and I could prove it, I would be the first person to make sure the sheriff's department where I live knew.
>
> Q.     So you don't have any evidence that you can point me to showing that anybody at Coffee County had anything to do with any of those events.
>
> A.     Correct.

[Doc. 60-7 at Page ID # 770].

23

The Court agrees with Plaintiffs that this testimony is irrelevant. Even if it is not necessarily overly prejudicial to Wesley, it would waste the jury's time and confuse the issues. *See* Fed. R. Civ. P. 403. Defendants assert that the testimony bears on Wesley's credibility, but the Court finds any probative value as to credibility is limited. Nothing about the statements bears on Wesley's truthfulness, and the statements relate to events that took place after the May 2019 incident and therefore do not shed light on the reasonableness of the officers' actions. Plaintiffs' in limine request no. 16 will therefore be **GRANTED**.

## II.     CONCLUSION

For the reasons stated above, and as set forth herein, Plaintiffs' motion in limine [Doc. 59] is **GRANTED IN PART AND DENIED IN PART**, as set forth herein.

SO ORDERED.

ENTER:

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE